UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                        )
JASON BOUDREAU,                         )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )    C.A. No. 13-388 S
                                        )
STEVE LUSSIER, et al.,                  )
                                        )
        Defendants.                     )
_____)

**ORDER**

WILLIAM E. SMITH, Chief Judge.

On June 2, 2015, Magistrate Judge Lincoln D. Almond issued a Report and Recommendation ("R&R") in the above-captioned matter (ECF No. 230) recommending that Plaintiff's Motion for Summary Judgment (ECF No. 157) be denied; that Defendants City of Cranston and Officers Bagshaw, Weller, and Carroll's (collectively, the "Cranston Defendants") Motion for Summary Judgment as to Counts I, II, and V (ECF No. 174) be granted; that Defendants City of Warwick and Detective Kevin Petit's (collectively, the "Warwick Defendants") Motion for Summary Judgment as to Counts I, II, III, and V (ECF No. 165) be granted; and that Defendants Steve Lussier, John Lussier, Donald Lussier, and Steve Sorel's (collectively, the "ATC Defendants") Motion for Summary Judgment (ECF No. 162) be granted as to Counts

I and II, and denied as to Count IV.  Plaintiff and the ATC Defendants filed objections (ECF Nos. 232 and 233, respectively), and all parties filed responses.  (ECF Nos. 234 (Warwick Defs.), 235 (ACT Defs.), 237 (Plaintiff), and 238 (Cranston Defs.).)

After careful de novo review (see Fed. R. Civ. P. 72(b)(3)), Magistrate Judge Almond's R&R is ADOPTED IN PART and REJECTED IN PART.  Specifically, this Court accepts and adopts Judge Almond's recommendation to: deny Plaintiff's Motion for Summary Judgment; grant the Cranston Defendants' Motion for Summary Judgment; grant the Warwick Defendants' Motion for Summary Judgment; and grant the ATC Defendants' Motion for Summary Judgment as to Counts I and II.  The Court declines to adopt the R&R with respect to Count IV against the ATC Defendants, and hereby grants the ATC Defendants' Motion on Count IV.[1]

I.   The Cranston Defendants

In Count I, Plaintiff alleges that the Cranston Defendants unlawfully searched his 2004 Toyota Corolla and 1995 Ford Explorer.  After Plaintiff was arrested for driving with a suspended license, the Cranston Defendants

---

[1]   The relevant facts, procedural background, and analysis are fully set forth in the R&R.  The Court limits its discussion to and presents only those facts pertinent to the parties' objections.

impounded both of his cars from the parking lot of his employer, Automatic Temperature Controls, Inc. ("ATC"), and subsequently conducted inventory searches. According to Plaintiff, his arrest, the impoundments, and the inventory searches were all a pretext for the Cranston Defendants to conduct warrantless searches of his cars in conjunction with an investigation into his possession of child pornography. (See R&R 9, ECF No. 230.)

Magistrate Judge Almond found that the Cranston Defendants were justified in impounding the cars pursuant to the "community caretaking function" and that the inventory searches were not a violation of the Fourth Amendment because "it is undisputed that the Cranston Police conducted inventory searches of the vehicles pursuant to Department policy." (Id. at 9-10 (citing Pl.'s Ex. 119, ECF No. 161-43).) This Court agrees that the impoundment of Plaintiff's cars was permitted by the community caretaking function. See United States v. Coccia, 446 F.3d 233, 239 (1st Cir. 2006) ("Courts, including this one, have frequently held that impoundments of vehicles for community caretaking purposes are consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances."). As the R&R notes, "it is undisputed that Plaintiff's vehicles were

3

on ATC's private property at the time of his arrest" and "that ATC, through one of its owners, advised the Cranston Police that it wanted Plaintiff's vehicles, the 2004 Toyota and the 1995 Ford, and certain other of Plaintiff's possessions, off of its property so that Plaintiff would not have to return to retrieve them."  (R&R 9, ECF No. 230.)  The inventory searches, however, require further analysis.

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents."  South Dakota v. Opperman, 428 U.S. 364, 369 (1976).  The purpose of inventorying impounded vehicles advances three purposes:

> [1] the protection of the owner's property while it remains in police custody, United States v. Mitchell, 458 F.2d 960, 961 (CA9 1972); [2] the protection of the police against claims or disputes over lost or stolen property, United States v. Kelehar, 470 F.2d 176, 178 (CA5 1972); and [3] the protection of the police from potential danger, Cooper v. California, [386 U.S. 58, 61-62 (1967)].

Opperman, 428 U.S. at 369.  The law is clear that a warrantless search must be conducted according to an established policy.  See Florida v. Wells, 495 U.S. 1, 8 (1990) ("Our cases clearly hold that an inventory search is reasonable under the Fourth Amendment only if it is done in accordance with standard procedures that limit the

4

discretion of the police." (emphasis in original)); United States v. Richardson, 515 F.3d 74, 85 (1st Cir. 2008) ("The Fourth Amendment permits a warrantless inventory search if the search is carried out pursuant to a standardized policy."). As long an inventory search is conducted in accordance with the policy, "[t]he subjective intent of the officers is not relevant." United States v. Hawkins, 279 F.3d 83, 86 (1st Cir. 2002).

The United States Supreme Court has held that there is no prohibition against an inventory search policy that allows for "the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." Colorado v. Bertine, 479 U.S. 367, 375 (1987). Thus, while a policy may not give police officers "uncanalized discretion," it may provide for "the exercise of judgment based on concerns related to the purposes of an inventory search." Wells, 495 U.S. at 4. For example, "[a] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." Id. Moreover, "[t]he reasonableness of any particular governmental activity does not necessarily or

invariably turn on the existence of alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 647 (1983). As long as the policy is reasonable, courts "are hardly in a position to second-guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the stationhouse." Id. at 648.

While it is indeed undisputed that the Cranston Police have an inventory search policy (see Pl.'s Ex. 119, ECF No. 161-43), Plaintiff argues in his Objection that the Cranston Defendants did not follow that policy when they searched his cars, which he claims were locked. (See Pl.'s Objection 5-14, ECF No. 232.) Cranston Police Department General Order 330.41 states: "It is the policy of the Cranston Police Department that any seized vehicle will be inventoried and a detailed list of the vehicle's effects properly recorded." (Pl.'s Ex. 119 at Section II, ECF No. 161-43.) However, one of the "Exceptions to the Motor Vehicle Inventory Policy" is that:

> All motor vehicles that are already locked at the time of the tow do not need to be inventoried. Any motor vehicles that are unlocked at the time of the tow must be inventoried prior to the tow to protect the Department from disputes over lost or stolen property, negligence, theft, and vandalism.

6

(Id. at Section III.F.2.)   Thus, Plaintiff claims that his cars should not have been inventoried pursuant to the policy.

As an initial matter, Plaintiff does not present any evidence that his 2004 Toyota Corolla was locked at the time he was arrested.[2]   Thus, there is no material fact in dispute concerning whether the Cranston Defendants followed their inventory policy with respect to Plaintiff's Toyota Corolla.   Regarding the 1995 Ford Explorer, Plaintiff cites one of Warwick Defendant Det. Petit's interrogatory responses, which states: "Located in the parking lot of ATC was a green Ford Explorer. . . . I observed the vehicle to be locked and did not enter it."   (Pl.'s Objection 11, ECF No. 232.)   Putting aside the question of whether this statement from Det. Petit – who is not a Cranston Defendant – is sufficient to get past summary judgment, and assuming

---

[2] Plaintiff also contends that the inventory search of his 2004 Toyota Corolla was in violation of the inventory policy because "[i]t is an undisputed fact that the Plaintiff was golfing with some of the ATC Defendants on June 24, 2011 and after golfing, Donald Lussier called the Plaintiff and asked him to return to the ATC offices.   It is an undisputed fact that the alleged inventory search did not include the Plaintiff's golf clubs . . . ."   (Pl.'s Objection 10, ECF No. 232.) Plaintiff also claims that he had tools in his car, which were not inventoried.   (Id.) However, Plaintiff has failed to present any evidence that his golf clubs or tools were actually in his car when it was impounded by the Cranston Defendants.

that the 1995 Ford Explorer was locked, Plaintiff's argument still fails.

The exception to the Cranston Police inventory policy is discretionary, not mandatory:  "vehicles that are already locked at the time of tow <u>do not need to</u> be inventoried."  (Pl.'s Ex. 119 at Section III.F.2, ECF No. 161-43 (emphasis added).)  Thus, a plain reading of the policy demonstrates that when the vehicle is unlocked, the officer must take an inventory, but when it is locked, the officer may use discretion to decide whether or not an inventory is necessary to advance the policy's purpose of "protect[ing] the Department from disputes over lost or stolen property, negligence, theft, and vandalism."  (<u>Id.</u>)

In this case, Plaintiff acknowledges that "[t]he Cranston Defendants seized the Plaintiff's car keys at the time of his arrest."  (Pl.'s Objection 12, ECF No. 232.) It follows logically that, in a case where the police have seized the keys to an impounded car, taking an inventory is necessary to protect the Department from allegations of theft.  By contrast, when a car to which the police do not have the keys is impounded, it would be in the Department's interest to decline to take an inventory rather than force its way into the car.  This level of discretion – determining whether or not inventorying a locked car would

8

further the goals of the inventory search policy – falls squarely into "the exercise of judgment based on concerns related to the purposes of an inventory search." <u>Wells</u>, 495 U.S. at 4.   Accordingly, the Cranston Defendants' inventory search of Plaintiff's cars did not violate the Fourth Amendment.[3]

Regarding Plaintiff's entrapment claim in Count II, the Court agrees with Magistrate Judge Almond that summary judgment for the Cranston Defendants is warranted. Plaintiff alleges that the Warwick Defendants and the Cranston Defendants conspired to "entrap" him into driving with a suspended license so that they could search his cars without a warrant.   However, the only evidence that Plaintiff has in support of this claim is Warwick Defendant Det. Petit's statement that "they are going to lure [Plaintiff] back to the business and he's got a laptop in his car that I need to grab." (See Pl.'s Objection 3, ECF No. 232.)   Det. Petit's use of the word "lure" is insufficient to establish entrapment.   As the R&R notes, "'[i]nducement requires not only giving the [individual] the opportunity to commit the crime but also a "plus"

---

[3] Plaintiff's contention that his office was unlawfully searched by the Cranston Defendants was not pled in his Complaint and thus is not properly before the Court. (See R&R 8 n.9, ECF No. 230.)

factor of government overreaching' such as use of 'excessive
pressure' including intimidation, threats or dogged
insistence." (R&R 7-8, ECF No. 230 (quoting United States
v. Gonzalez-Perez, 778 F.3d 3, 11 (1st Cir. 2015)).) Here,
the Cranston Defendants got information that Plaintiff
would be driving with a suspended license, but they did no
more than give him the opportunity to do so.

Finally, with regard to Count V – municipal liability
– the Cranston Defendants are correct that "[t]he record in
the present case contains nothing that links Officer
Carroll, Bagshaw and Sergeant Weller's actions with any
policy or custom of the City of Cranston, and it is
Plaintiff's burden to show that those alleged
unconstitutional activities were the direct result of a
Cranston policy or custom." (Cranston Defs.' Mot. for
Summ. J. 10, ECF No. 174-1.) Accordingly, the Court
concurs with Magistrate Judge Almond that the Cranston
Defendants are entitled to summary judgment.

II. The Warwick Defendants

Plaintiff claims that the Warwick Defendants conducted
an unlawful search of his office and office computer, and
that Det. Petit included false statements and omitted
material facts in his Search Warrant Affadavits. Plaintiff
asserts that he had a reasonable expectation of privacy in

10

his office and work computer, and therefore the warrantless search violated his Fourth Amendment rights.  The Warwick Defendants argue that Det. Petit had permission to search Plaintiff's computer from ATC Defendant John Lussier, the computer's owner, and that there is no evidence that Det. Petit searched Plaintiff's office.

The cases Plaintiff cites, ostensibly in support of his claim that John Lussier could not give consent to search Plaintiff's work computer, prove Defendants' point. See, e.g., United States v. Ziegler, 474 F.3d 1184, 1192 (9th Cir. 2007) (finding that although Plaintiff had a reasonable expectation of privacy in his office, "Frontline, as the employer, could consent to a search of the office and the computer that it provided to Ziegler for his work"); United States v. Bailey, 272 F. Supp. 2d 822, 837 (D. Neb. 2003) ("Bailey cannot assert any Fourth Amendment violation from the search of his work computer provided to him by American Family to conduct Mr. Southwell's business on behalf of American Family."). Plaintiff is correct that Det. Petit could not have conducted a warrantless search of Plaintiff's office computer without his employer's permission; but here, there is uncontroverted evidence that the owner of Plaintiff's work computer gave Det. Petit permission to search it.

(See R&R 12, ECF No. 230.)  Thus, the search did not violate the Fourth Amendment.  See United States v. Carter, 569 F.2d 801, 803-04 (4th Cir. 1977) (search of a company vehicle with employer's consent was proper because the employee "could not expect to use the vehicle free from inspection by either his employer or by the police acting with his employer's consent"); United States v. Zhu, 23 F. Supp. 3d 234, 238 (S.D.N.Y. 2014) (finding that employer could consent to search of employee's laptop).[4]

With regard to Det. Petit's Search Warrant Affidavits, Plaintiff's claim fails because, as Magistrate Judge Almond found, none of the alleged misstatements "would have been material to the probable cause determination at issue," and thus there was no Fourth Amendment violation.  (R&R 13, ECF No. 230.)

III. The ATC Defendants

Plaintiff alleges that the ATC Defendants violated the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511 and 2520, by installing a software program called System Surveillance Pro ("SSP") on his office computer

---

[4] As the R&R notes, there does not appear to be any evidence that a search of Plaintiff's office as a whole was conducted, particularly in light of Det. Petit's unequivocal denial of that search. (See R&R 14-15, ECF No. 230.)  However, even if there were, the record shows that John Lussier gave his consent. (See id. at 15 n.11.)

without his knowledge or consent.  The ECPA generally
prohibits the "intercept[ion]" of "any wire, oral, or
electronic communication."  <u>See</u> 18 U.S.C. § 2511.  To
"intercept" is defined as "the aural or other acquisition
of the contents of any wire, electronic, or oral
communication through the use of any electronic,
mechanical, or other device."  <u>Id.</u> at § 2510(4).
Fundamentally, the parties dispute whether or not SSP,
which takes screenshots, intercepted Plaintiff's
communications under the ECPA.

Plaintiff relies on the SSP License Agreement, which
contains statements such as "[u]nder certain circumstances,
the interception of communications without the actual or
implied consent of the involved parties may be unlawful.
This software is designed for use when any required
consents have been obtained, and is not intended for the
surreptitious interception of communications." (R&R 17,
ECF No. 230 (quoting Pl.'s Ex. 9 at 2, ECF No. 159-8).)
Plaintiff also provides screenshots that show his emails
and banking information. (<u>See</u> Pl.'s Exs. 2, 3, 15, 26, 66,
121, and 122, ECF Nos. 159-1, 159-2, 159-14, 159-25, 160-
26, 161-45, and 161-46, respectively.)  Plaintiff further
asserts that SSP is "nearly identical" to screenshot
technology that was found to violate the ECPA in <u>Shefts v.</u>

13

Petrakis, No. 10-cv-1104, 2012 WL 4049484 (C.D. Ill. Sept. 13, 2012). (See R&R 17-18, ECF No. 230.) Defendants counter that Plaintiff has not presented any non-hearsay evidence in support of his contention that SSP intercepts emails. Defendants, for their part, rely on affidavits from Russell Turner, the purported developer of SSP, and Brittnee Morgan, a computer forensic expert for the Rhode Island State Police, both of whom opine that SSP does not "intercept" communications under the ECPA. (See id. at 19.)

Whether an "interception" under the ECPA must be contemporaneous with transmission of the communication is an open question in the First Circuit. See United States v. Councilman, 418 F.3d 67, 80 (1st Cir. 2005) (en banc) ("[T]his appeal does not implicate the question of whether the term 'intercept' applies only to acquisitions that occur contemporaneously with the transmission of a message from sender to recipient or, instead, extends to an event that occurs after a message has crossed the finish line of transmission . . . . We therefore need not decide that question.").[5]   However, "[e]very circuit court to have

_____

[5]   Councilman held that "the term 'electronic communication' includes transient electronic storage that is intrinsic to the communication process for such communications." United States v. Councilman, 418 F.3d 67,

considered the matter has held that an 'intercept' under the ECPA must occur contemporaneously with transmission." Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 113 (3d Cir. 2003), as amended (Jan. 20, 2004) (citing United States v. Steiger, 318 F.3d 1039, 1048-49 (11th Cir. 2003); Konop v. Hawaiian Airlines, Inc., 302 F.3d 868 (9th Cir. 2002); Steve Jackson Games, Inc. v. U.S. Secret Serv., 36 F.3d 457 (5th Cir. 1994)).[6]  Absent any contrary guidance from the First Circuit, this Court agrees with the majority of courts that have held that interception of electronic communications under the ECPA must be contemporaneous.[7]

---

79 (1st Cir. 2005).   Rather, electronic communications do not lose protection under the ECPA "for the brief instants during which they are in temporary storage en route to their destinations." Id. at 78.  Because the defendant's only argument for why his conduct did not constitute "interception" was based on the theory the court rejected - that emails in storage en route to their destination are not "electronic communications" - the court determined that it need not reach the question of whether an interception must be contemporaneous with transmission. Id. at 79-80.

    [6] Cf. United States v. Szymuszkiewicz, 622 F.3d 701, 703, 706 (7th Cir. 2010), as amended (Nov. 29, 2010) (finding that a "'rule' that directed Outlook to forward to Szymuszkiewicz all messages [his boss] received" intercepted communications under the ECPA because "if both Szymuszkiewicz and [his boss] were sitting at their computers at the same time, they would have received each message with no more than an eyeblink in between," which is "contemporaneous by any standard").

    [7] Plaintiff relies on Williams v. Stoddard, No. PC 12-3664, 2015 WL 644200 (R.I. Super. Feb. 11, 2015), in which the Rhode Island Superior Court adopted the reasoning of

However, "[t]here are not many cases analyzing the application of the ECPA to screen-capture technology." Shefts, 2012 WL 4049484, at *9. Thus, although Magistrate Judge Almond expressed doubts about the sufficiency of Plaintiff's evidence (see R&R 18, ECF No. 230), he was "hesitant to make binding conclusions of law in a vacuum without the benefit of a full evidentiary record on the operation of SSP as installed on Plaintiff's office computer." (Id. at 21.) Yet the ATC Defendants contend in their Objection that:

> Magistrate Judge Almond misallocated to the ATC Defendants the burden of proving that no 'interception' had occurred. . . . Because Plaintiff did not retain an expert witness and cannot retain one now (the deadline to retain expert witnesses having long passed), there was no need to examine the ATC Defendants' contentions in a vacuum.

(ATC Defs.' Objection 6-7, ECF No. 233-1.)   Instead, Magistrate Judge Almond's "analysis should have concluded when he acknowledged that Plaintiff could not prove his

---

Judge Reinhardt's dissent in Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 886-92 (9th Cir. 2002), and rejected the contemporaneity requirement for "interception" under the ECPA.  See Williams, 2015 WL 644200, at *6.  As the ATC Defendants note, this case "is in the distinct minority." (ATC Defs.' Objection 10, ECF No. 233-1.)  Indeed, the court in Williams acknowledged that "most federal circuit courts which have considered the question have interpreted this definition as requiring that an interception must occur contemporaneously with the transmission of the electronic communication."  2015 WL 644200, at *6.

case under the ECPA without expert testimony as to how the SSP program operates and functions." (Id. at 7.)

The ATC Defendants are correct that "[i]n the context, as in this case, of a defensive motion for summary judgment, the moving party's burden is merely to 'aver an absence of evidence to support the nonmoving party's case.'" (Id. at 4-5 (emphasis in original) (quoting Hartford Ins. Co. v. Gen. Elec. Co., 526 F. Supp. 2d 250, 255 (D.R.I. 2007)).) It is then Plaintiff's burden to show that a "trialworthy issue remains." (Id. at 5 (quoting Hartford, 526 F. Supp. 2d at 255).) The question is thus whether Plaintiff has "present[ed] 'enough competent evidence to enable a finding'" that the screenshots were contemporaneous with transmission of his emails. See Hartford, 526 F. Supp. 2d at 256 (quoting Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993)).

Regarding the SSP License Agreement, this Court agrees with Magistrate Judge Almond that "Plaintiff's reliance upon the language contained in the SSP License Agreement as proof of 'interception' is insufficient because it is conclusory, lacks sufficient foundation and is arguably hearsay." (R&R 18, ECF No. 230.) With respect to the screenshots, the ATC Defendants contend that those exhibits "cannot speak for themselves" and thus Plaintiff "cannot

17

prove his ECPA claim without the specialized knowledge of an expert witness as to how the SSP program operates or functions." (ATC Defs.' Objection 5, ECF No. 233-1.) However, Plaintiff argues in his Objection that:

> The screenshots in the attached Exhibit No. 2 clearly show that what is displayed on the Plaintiffs screen is being transmitted at the moment the screenshot is taken. The screenshots conclusively show that the webpage data is in the process of being transmitted when the screenshot was created. The bottom status bar of the website depicted in the screenshot displays that the website is still loading, or transmitting. These screenshots therefore conclusively prove that System Surveillance Pro does create screenshots during the transmission of electronic communications.

(Pl.'s Objection 59-60, ECF No. 232.)

Exhibit 2 does not, as Plaintiff claims, show anything "loading" or "transmitting."[8]  (See Pl.'s Ex. 2, ECF No. 159-1.)  While it includes pictures of emails that Plaintiff was in the process of drafting, those screenshots were captured before the emails were sent.  (See id. at 2-5.)  Moreover, Plaintiff presents no evidence that these emails were actually sent; in other words, Plaintiff has

---

[8] Although Plaintiff's Objection only cites to Exhibit 2, the Court notes, based on its review of the record, that the screenshots in Exhibits 52-2, 66, and 122 (ECF Nos. 160-12, 160-26, and 161-46) do arguably indicate that a "website is still loading, or transmitting" (Pl.'s Objection 60, ECF No. 232); however, none of Plaintiff's exhibits show a screenshot that was taken while any communication to or from Plaintiff was transmitting.

not demonstrated that they ever became "communications." Exhibit 2 also includes a screenshot that is time-stamped 16:10:21, showing an email that Plaintiff received at 4:10 p.m. (See id. at 6.) Yet this does not, on its face, prove contemporaneity because the email could have arrived at any time between 4:10:00 and 4:10:21 p.m.[9]

The bottom line is that this is a case where, "in order to assess the validity of plaintiff['s] claims . . . the jury must understand . . . how the [technology] functions." Perez v. Hyundai Motor Co., 440 F. Supp. 2d 57, 71 (D.P.R. 2006). Plaintiff cannot simply present the screenshots and declare that they were taken contemporaneously with the transmission of his communications.

Testimony that "is based upon scientific, technical, or other specialized knowledge" requires an expert. Id. at

---

[9] Furthermore, the Court notes that the 4:10 p.m. email in Exhibit 2 (ECF No. 159-1) is highlighted; based on lay knowledge of Microsoft Outlook, a reasonable juror could determine from the highlighting that Plaintiff had already received and clicked on the email when the screenshot was taken. See United States v. Ganier, 468 F.3d 920, 926 (6th Cir. 2006) (noting that "[t]he average layperson today may be able to interpret the outputs of popular software programs," such as Microsoft Word and Outlook). Ganier also provides a useful juxtaposition to the software at issue here. Unlike Outlook, SSP is not a popular software program used by the average layperson. Thus, as detailed below, testimony concerning how SSP works requires an expert.

69 (quoting Fed. R. Evid. 701 Advisory Committee's Notes to 2000 Amendment). Courts have found that the functioning of computer programs is the subject of expert testimony. For example, in Perez, the court held that a lay witness could not testify regarding the time of crash recorded by a car's Electronic Control Unit ("ECU") – even though the witness had personally observed that data at the inspection – because the necessary foundation concerning how the ECU operated required specialized knowledge. Id. at 70-71. Likewise, in United States v. Ganier, the Sixth Circuit found that a layperson could not testify about a forensic test that reported the defendant's computer searches. 468 F.3d 920, 926 (6th Cir. 2006). There, the court explained:

> Because the categorization of computer-related testimony is a relatively new question, comparisons with other areas of expert testimony are instructive. Software programs such as Microsoft Word and Outlook may be as commonly used as home medical thermometers, but the forensic tests [the agent] ran are more akin to specialized medical tests run by physicians.

Id. Like the ECU in Perez and the forensic test in Ganier, the technology at issue in this case – SSP – is not "commonly used" and therefore would not be within the experience of the average juror.

Thus, without an expert, Plaintiff will have no way to demonstrate when the screenshots were taken in relation to

the transmission of his emails, and the jury would have no basis to find that they were taken at the same time.  See Expert Bus. Sys., LLC v. BI4CE, Inc., 411 F. Supp. 2d 601, 605 (D. Md. 2006), aff'd, 233 F. App'x 251 (4th Cir. 2007) (granting Defendant's motion for summary judgment on ECPA and Computer Fraud and Abuse Act claims due to Plaintiff's "lack of any substantial probative evidence that defendants wrongfully 'intercepted' the disputed e-mails" and "lack of any expert opinion evidence" concerning claim that Defendants used a Trojan Horse to destroy evidence on his computer); cf. Shefts, 2012 WL 4049484, at *2, *9 (finding ECPA violation where Plaintiff "put[] on undisputed evidence," including an affidavit from a technical expert, that "any emails sent by Plaintiff on his Yahoo! account via his desktop computer would have been captured by SpectorPro as they were transmitted to Yahoo! via the internet" (emphasis in original)).[10]

Accordingly, this Court declines to adopt the R&R concerning Plaintiff's ECPA claim, and hereby grants the ATC Defendants' Motion for Summary Judgment.

---

[10] Because the Court finds that Plaintiff's evidence is insufficient to support a claim under the ECPA, it need not reach the sufficiency of the ATC Defendants' affidavits. (See R&R 19-21, ECF No. 230.)

IV.   Conclusion

For the foregoing reasons, Magistrate Judge Almond's R&R is ADOPTED IN PART and REJECTED IN PART. The Court adopts Judge Almond's R&R in the following respects: Plaintiff's Motion for Summary Judgment is DENIED; the Cranston Defendants' Motion for Summary Judgment is GRANTED; the Warwick Defendants' Motion for Summary Judgment is GRANTED; and the ATC Defendants' Motion for Summary Judgment is GRANTED as to Counts I and II. As discussed above, the Court does not adopt the R&R with respect to Count IV against the ATC Defendants, and hereby GRANTS the ATC Defendants' Motion for Summary Judgment on Count IV. Accordingly, Judgment shall enter in favor of all Defendants.


IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date: November 30, 2015